332 So.2d 228 (1976)
STATE of Louisiana
v.
Ellison C. SHEPHERD.
No. 57385.
Supreme Court of Louisiana.
May 17, 1976.
*229 Joel B. Dickinson, Joel B. Dickinson & Associates, Baton Rouge, for defendant-appellant.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Ossie B. Brown, Dist. Atty., Anthony J. Graphia, James E. Boren, Asst. Dist. Attys., for plaintiff-appellee.
SUMMERS, Justice.
Ellison C. Shepherd was charged in an indictment filed by the grand jury of East Baton Rouge Parish on July 23, 1974 with the second degree murder of Eddie C. Robinson, Jr., on June 9, 1974. After a trial by jury on February 18, 19 and 20 of 1975, a verdict of guilty of manslaughter was returned. Shepherd was sentenced to be confined in the custody of the Louisiana Department of Corrections at hard labor for fifteen years. Seven assignments of error are urged on this appeal.

Assignment 1
Prior to trial, on February 14, 1975, defendant filed a motion to quash the indictment, alleging as grounds therefor that the grand jury which indicted him was illegally *230 constituted because women were systematically excluded therefrom.
In his brief, defense counsel relies upon the decisions in Daniel v. Louisiana, 420 U.S. 31, 95 S.Ct. 704, 42 L.Ed.2d 790 (1975), Taylor v. Louisiana, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975) and this Court's decision in State v. Gaines, 315 So.2d 298 (La.1975).
This grand jury was empaneled prior to July 23, 1974 when it rendered its indictment. At that time Section 41 of Article VII of the Louisiana Constitution of 1921 provided that "no woman shall be drawn for jury service unless she shall have previously filed with the clerk of the District Court a written declaration of her desire to be subject to such service." Article 402 of the Code of Criminal Procedure at that time was to the same effect. Repeated decisions of this Court affirmed these enactments. Their constitutionality had been supported by the decision of the United States Supreme Court in Hoyt v. Florida, 368 U.S. 57, 82 S.Ct. 159, 7 L.Ed.2d 118 (1961).
Louisiana's Constitution of 1974 became effective at midnight on December 31, 1974. La.Const. art. XIV, § 35 (1974). Any citizen of the State who has reached the age of majority is eligible, under Section 33 of Article V of that Constitution, to serve as a juror within the parish in which he is domiciled. This constitutional provision is not retroactive. La.Const. art. XIV, § 26 (1974).
Provision for exemptions from jury duty was, by Section 33 of Article V, to be provided for by rule of this Court. Rule 25 of this Court which became effective January 1, 1975, provides that no citizen of this State shall be excluded from jury service on account of sex. Thus, it will be seen that on January 1, 1975 and thereafter women could no longer be exempt from jury service in this State on the basis of sex, while prior to that time they could not be compelled to serve without their expressed desire to do so.
Then, on January 21, 1975, the United States Supreme Court decided Taylor v. Louisiana, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690, holding that in a trial by jury in 1972 the Sixth and Fourteenth Amendments were violated by Article VII, Section 41, of the Louisiana Constitution of 1921 and Article 402 of the Code of Criminal Procedure.
Six days after the decision in Taylor v. Louisiana the United States Supreme Court decided Daniel v. Louisiana, 420 U.S. 31, 95 S.Ct. 704, 42 L.Ed.2d 790 (1975) and held that the Taylor decision was not to be applied retroactively, as a matter of Federal law, to convictions which were obtained by juries empaneled prior to the date of the Taylor decisionJanuary 21, 1975.
On June 23, 1975 this Court decided, in State v. Gaines, 315 So.2d 298, that two grand jury indictments returned on January 6, 1975, were illegally returned where no women were included in the general venire, even though the grand jury had been empaneled prior to January 1, 1975. On that same day we decided State v. Lewis, La., 315 So.2d 626, holding that a trial by jury commenced and concluded during the month of April 1974, in which no women served, was not subject to constitutional attack. The decision recognized that the validity of the Louisiana constitutional and statutory provisions, exempting women unless they declared their intention to serve, were not affected by the decisions of the Taylor and Daniel cases prior to the effective date of the Taylor decisionJanuary 21, 1975.
Also, in State v. Rester, 309 So.2d 321 (La.1975) and State v. Devore, 309 So.2d 325 (La.1975), we decided that, as a matter of state law, the rule of the Taylor case would not be applied retroactively. In State ex rel. James v. Parker, 308 So.2d 284 (La.1975), writs were denied in a case where the trial court refused to quash an indictment returned before the Taylor case was decided by a grand jury empaneled prior to January 1, 1975, but where the trial *231 was scheduled to take placed after the Taylor decision on January 21, 1975.
Upon this authority we conclude that the indictment rendered prior to January 1, 1975 by a grand jury, on which women have not served because none had declared her willingness to do so, resulting in a conviction in a February 1975 trial, where women served, is not infirm as a matter of federal or state law. For the reasons stated, defendant's Assignment 1 is without merit.

Assignment 2
James G. Joseph testified for the State. He was a picketer at a strike being staged at Schuylkill Metal Corporation where Shepherd and Walter Brumfield also worked. All of them were on strike. Larry Butler, although he was not employed there, associated with the strikers and walked the picket line with Shepherd and Brumfield.
Some time prior to June 9, 1974, according to the defense, there was a discussion among the strikers about "scaring" employees who refused to honor the strike. Eddie Robinson was one who was mentioned.
On Saturday night, prior to the shooting, Brumfield and Butler met. Brumfield had a pistol. They agreed to carry out their plan to "scare" the strike breakers. They agreed to go in Butler's car and to pick up Shepherd. After picking up Shepherd, they decided that Robinson would be the subject of their plan.
They drove to Robinson's house, and stopped the car nearby, Shepherd remaining in the car while Butler and Brumfield approached Robinson's house. Butler went up on the porch and knocked on the door. When Odette Louis, Robinson's sister-in-law, answered, she was asked if Robinson lived there. She said yes and went to awaken him.
Butler then left the porch, and as Robinson approached the door, Butler unloaded an automatic pistol into the door, shooting five times. One of the bullets struck Robinson in the neck, and he died from the wound shortly thereafter.
Joseph was at the picket line on the morning of June 9 shortly after the slaying. He left the site in his automobile around 7 o'clock and met Butler, Brumfield and Shepherd near the reform school about four blocks away. Butler, who was driving, stopped, waved Joseph down, and they entered into conversation.
When the State's attorney asked Joseph, "Tell us what the discussion was about?" defense counsel objected, saying, "The only thing he can tell is what Shepherd might have said, and he can't tell what the other two said," because it was "[h]earsay as to the other two . . . ."
After another question and answer, the State's attorney asked, "All right. Now, tell us what conversation took place." Defense counsel again objected "to anything except what Shepherd told him." The objection was overruled and this ruling is relied upon as error in support of this assignment. The witness then testified to conversation with Brumfield and Shepherd in which they told him they had been to Robinson's house and had shot at the house and "they might've hit someone."
An almost identical question was considered in State v. Brumfield, 329 So.2d 181 (Decided February 23, 1976) involving this same testimony of Joseph, who testified in both trials. The only difference is that in State v. Brumfield Joseph testified that only Shepherd spoke, whereas in the instant case he seems to attribute the conversation to both Brumfield and Shepherd. (Under our holding the difference is immaterial.) A finding was made in the Brumfield decision that a prima facie case of conspiracy between Butler, Brumfield and Shepherd was established by the State's evidence. There, considering the fact that Shepherd's remarks were made to Joseph immediately after the accomplishment *232 of the crime, while the three coconspirators were still together in the automobile used in the crime, it was held that the statement to Joseph was properly admitted into evidence. The same holding is applicable here. La.R.S. 15:455. This assignment is without merit.

Assignment 3
While the State's attorney continued questioning Joseph, he asked if Brumfield and Shepherd had said how they knew they might have hit someone. Then he asked:
"Q. They didn't tell you it's because they shot into the door?
A. No, they said they fired at the house.
Q. And `it seemed like somebody was hit.' that's what was said?
A. Right.
Q. `It seemed like somebody was hit?'
A. Right."
Defense counsel objected, saying "I don't believe he said that to start with, and I ask that . . . the jury disregard it." The trial judge then instructed the State's attorney to ask him what was said. When asked, Joseph testified Brumfield and Shepherd said, "Maybe somebody might've been hit."
In brief defense counsel argues the question was leading and prejudicial.
"A leading question is one which suggests to the witness the answer he is to deliver, and though framed in the alternative, is inadmissible when propounded to one's own witness, unless such witness be unwilling or hostile." La.R.S. 15:277.
Here the State's attorney was asking the witness if "It seemed like somebody was hit." While Joseph had testified, "[t]hey might have hit someone." The two phrases are essentially the same in meaning. There was no suggestion of any fact which had not been proven. The State's attorney was trying to obtain a substantiation of Joseph's previous testimony. It is not a leading question to ask a witness what he said previously. There is no merit in this assignment. State v. Sneed, 328 So.2d 126, 134 (La.1976).

Assignment 4
In this assignment, defense counsel claims error in overruling his objections to questions propounded by the State's attorney to Joseph on redirect examination. These questions, it is contended, amounted to cross-examination of Joseph about testimony he gave in the Brumfield trial, which amounted to browbeating by the State's attorney of his own witness in an attempt to make him change his testimony. Other than to refer to five pages of the transcript and two questions and one answer, the defense does not point out wherein the errors lie. The questions and answer referred to in brief are:
"Q. You were here at Brumfield's trial, weren't you?
A. Yes, I was here.
Q. And you know what Brumfield claimed at the trial, don't you?"
Defense counsel objected that the question was too broad and should, instead, refer to specific testimony. Thereafter the State's attorney questioned Joseph about what Brumfield claimed at his trial and how many times Joseph had talked to him about the case. To the latter question Joseph answered, "about a half a dozen, I guess."
Again defense counsel objected, presumably because of the prosecutor's tone of voice, saying he was antagonistic to his own witness. The objection was overruled.
Joseph was then asked if the State's attorney had asked him what they (Brumfield and Shepherd) had told him on the *233 morning of the 9th. Defense objection was again overruled.
Continuing, the State's attorney asked Joseph if he had testified at the Brumfield trial and if he had given the same testimony about Brumfield saying Butler fired the gun. Joseph answered, "No."
Finally Joseph was asked if he was present when the prosecutor argued the case to the jury in the Brumfield trial and if he talked to anybody about the case or read about it, to which Joseph replied in the negative. He did say, though, that he knew Butler testified against Brumfield at the Brumfield trial.
All of the foregoing followed the cross-examination of Joseph by defense counsel in which he elicited from Joseph that he was not told on the morning of the 9th that "they shot at the door" but learned that since. He also said, contrary to his testimony on direct, that only Brumfield mentioned the shooting. Joseph also indicated uncertainty about his testimony on direct, saying at times that he didn't remember. He also, on cross-examination, admitted that some of his testimony was contrary to his testimony at Brumfield's trial.
From the testimony it appears that this witness was probably illiterate and experienced difficulty expressing himself properly. Also, he apparently found himself in an untenable position testifying against his co-worker, and this caused him to vacillate. Under these circumstances we find nothing wrong with the questions of the State's attorney, believing that he was attempting to straighten out the confused testimony and seeking to assist the witness in recollecting the events. These efforts did not amount to an attempt to impeach his own witness, and because of the witness' inability to express himself, the questions were not leading. Where the prosecutor's alleged antagonistic attitude is relied upon, because of his tone of voice and attitude, the ruling of the trial judge is entitled to great weight. State v. Sneed, 328 So.2d 126, 134 (La. 1976).
This assignment is without merit.

Assignment 5
Error is claimed because the trial judge overruled defendant's objection to three photographs, allegedly made through a mail slot in the wall near the front door of the Robinson house.
It was the State's theory that Butler and Brumfield viewed Robinson within the house through the mail slot as he approached the front door and, when he was at the proper spot, shot at him through the door. It was to show that a person approaching the door from within the house could be viewed through the mail slot from the outside that the photographs were offered.
The objection that this evidence is not relevant is not well-founded. If the evidence tends to show the commission of the offense or establishes facts necessary to be known to explain a relevant fact, or which support an inference raised by such fact, the evidence is admissible. La.R.S. 15:441; State v. Vince, 305 So.2d 916 (La. 1974).
This assignment is without merit.

Assignment 6
Again the defense complains that the State's attorney was guilty of browbeating and ridiculing a witness. This time, however, the witness, Margie Evans, was a defense witness on cross-examination. The principal defense complaint seems to be that the State's attorney repeatedly referred to the contradictions in the witness' testimony at the Brumfield trial.
Aside from the latitude allowed in cross-examination, a review of the questioning complained of fails to warrant reversal *234 of the ruling of the trial judge. The cross-examination was aimed at showing that the witness was biased, had an interest, or had been corrupted. Thus it was competent to question her as to any particular fact showing or tending to show such bias, interest or corruption. La.R.S. 15:492. For instance:
"Q. You know that Larry Butler testified against Walter Brumfield in his trial, don't you?
A. Yes.
Q. That upset you?
A. No.
Q. Did Butler tell the truth?
A. No.
Q. Butler testified falsely against your fiance and that didn't upset you?
. . . . . .
(Defense objection overruled)
. . . . . .
A. Yeah, it upset me to an extent.
Q. I think it did, didn't it?
A. Uh-huh.
Q. Why did you tell the jury it didn't?"
In another instance the State's attorney referred to the witness' testimony at the Brumfield trial in order to clarify her testimony on direct. No objection was entered by the defense to the entire cross-examination except the one referred to above. At no time during the cross-examination did the defense complain that the witness was being browbeaten or ridiculed. La.R.S. 15:275, 15:280.
This assignment is without merit.

Assignment 7
Defendant's motion for a new trial is
". . . predicated upon the fact that although he was found guilty of manslaughter, the jury had to base its verdict strictly on `guilt by association,' as there was no conspiracy shown and no agreement between the parties that anyone would be hurt much less killed, and that by a preponderance of the evidence, it was proven that defendant did not commit any overt action that could possibly constitute guilt on his part."
And,
"The only evidence against defendant was the testimony by Larry Butler an accomplice, who was the one who actually pulled the trigger that resulted in the death of Eddie Robinson, and he was rewarded handsomely by the District Attorney for turning state's evidence."
As we understand this contention, the defense contends that except for Butler's testimony there would be no evidence to convict Shepherd. This, of course, is a fact question concerned with credibilitya matter exclusively within the province of the jury, dealing as it does with guilt or innocence.
As it applies to this case, "Manslaughter is: . . . (2) A homicide committed, without any intent to cause death or great bodily harm." La.R.S. 14:31 (2). The brief review of the evidence incorporated in this opinion alone demonstrates that there is some evidence of all elements of the crime of manslaughter as defined above.
Only when there is no evidence at all of the crime or an essential element thereof may this Court upset a jury finding of guilty. State v. Snedecor, 294 So.2d 207 (La. 1974). And an allegation that the verdict is contrary to the law and evidence presents no question of law for review. State v. Bowen, 292 So.2d 197 (La. 1974).
For the reasons assigned, the conviction and sentence are affirmed.
CALOGERO, J., concurs.